UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEIDRA GRANT                                    CIVIL ACTION
O/B/O C.L.P.

VERSUS                                          NUMBER: 12-1306

CAROLYN W. COLVIN, ACTING                       SECTION: "S"(5)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying the application for Supplemental Security Income ("SSI") benefits of the plaintiff-in-interest herein, C.L.P. (Rec. docs. 18, 19).

Deidra Grant, mother of plaintiff-in-interest herein, C.L.P., filed an application for SSI benefits on behalf of the minor child on December 15, 2009, with a protective filing date of November 17 or 19, 2009, alleging disability as of November 17, 2009. (Tr. pp. 90-93, 105, 119). In a Disability Report that appears in the record, the conditions for which benefits were sought were identified as speech, hearing, learning, and behavior disorders.

(Tr. pp. 108-115).[1]/ Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on March 19, 2010.  (Tr. pp. 57-60).  Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on November 10, 2010 at which C.L.P. and his mother testified.  (Tr. pp. 61-62, 33-55).  On December 1, 2010, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 14-32).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-6).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.  THE SUMMARY CONCLUSION THAT PLAINTIFF DOES NOT MEET A LISTING IS CONTRARY TO *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007).

II. THE FINDINGS THAT PLAINTIFF HAS LESS THAN MARKED LIMITATIONS IN ATTENDING AND COMPLETING TASKS AND IN CARING FOR HIMSELF ARE CONTRARY TO SSR 09-1p, SSR 09-2p, SSR 09-4p, and 20 C.F.R. § 416.924a(b)(5), AND ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

---

[1]/According to a Disability Report that appears in the record of the proceedings held below, a previous application for SSI benefits had been filed on C.L.P.'s behalf which was denied at the initial level of the Commissioner's administrative review process on June 8, 2009.  (Tr. pp. 105-106).

(Rec. doc. 18-2, pp. 16-17).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant was born on January 27, 1996.  Therefore, he was an adolescent on November 17, 2009, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2.   [t]he  claimant has not engaged in  substantial gainful activity since November 17, 2009, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.   [t]he  claimant has the  following severe  impairments: oppositional defiant disorder (ODD) and learning disorder (20 CFR 416.924©).   These are severe impairments within the meaning of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and the Regulations.

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.   [t]he claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926(a).

6.   [t]he claimant has not been disabled, as defined in the Social Security Act, since November 17, 2009, the date the application was filed (20 CFR 416.924(a)).

(Tr. pp. 20, 28).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v.

Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant, whether a child or an adult, bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Fraga, 810 F.2d at 1301.  In making a disability determination on a child, the Commissioner utilizes the three-step sequential analysis set forth in 20 C.F.R. §416.924, as follows:

1.  determine whether the child engaged in substantial gainful activity during the relevant time frame and, if not;

2.  determine whether the child has a medically determinable severe impairment and, if so;

4

3.  determine whether the impairment meets,  medically
    equals, or is functionally  equal to an impairment
    set forth in the Listing of Impairments,  Appendix
    l, Subpart P, Part 404.

> See  Verrett ex rel. Girod v.
> Commissioner  of Social Security,
> No.  99-CV-3647, 2001 WL  179922 at
> *1 n.7 (E.D. La. Feb. 20, 2001).

In determining whether a child's impairment is functionally equivalent to one of those set forth in the Listing of Impairments, the Commissioner considers the child's limitations in the following six domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and, health and physical well-being.  20 C.F.R. §416.926a(b)(1). To be functionally equal to a listing and thus of listing-level severity, the child must have "marked" limitations in two of the six domains or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(a).  A marked limitation exists when an impairment or combination of impairments seriously interferes with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. §416.926a(e)(2)(I).  A child's day-to-day functioning may be seriously limited when his impairments limit only one activity or when the interactive cumulative effects of his impairments limit several activities.  Id.  A marked limitation is one that is more than moderate but less than extreme.  Id.  No one piece of information can be viewed in isolation in determining whether a

5

particular limitation is marked.  20 C.F.R. §416.926a(e)(4).

In evaluating a child's ability to function in any particular domain, the Commissioner is to consider: 1) the activities the child is able to perform; 2) the activities the child is not able to perform; 3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; 4) whether the child has difficulty with activities at home, in childcare, at school, or in the community; 5) whether the child has difficulty independently initiating, sustaining, or completing activities; and, 6) what kind of help the child needs to do activities, how much, and how often.  20 C.F.R. §416.926a(b)(2); Mapps ex rel. M.J. v. Astrue, No. 09-CV-2226, 2010 WL 1946662 at *8 (N.D. Tex. Apr. 30, 2010), adopted, 2010 WL 1948363 (N.D. Tex. May 13, 2010).

The documentary evidence that was generated during the relevant time period[2]/ begins with records from the Hammond Westside Upper Elementary School which indicate that plaintiff received an out-of-school suspension on November 19, 2008 for conduct that was injurious to others after he pushed another

---

[2]/Under 20 C.F.R. §416.912(d), the Commissioner is to develop the medical history of an SSI claimant for at least twelve months prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary.  As plaintiff protectively filed his application for SSI benefits in November of 2009 and alleged an onset date within that month, the relevant time period begins in October of 2008.

student in the hallway. (Tr. p. 156). Plaintiff received another out-of-school suspension on December 1, 2008 for willful disobedience and for disturbing the school/habitually violating rules after refusing to listen to directions and engaging in classroom outbursts. (Tr. p. 159). A third suspension was imposed on February 27, 2009 after plaintiff used profane language in class towards other students and the teacher. (<u>Id</u>.). On this occasion, it was noted that warnings, redirection, and exercise as a form of punishment were simply not effective in deterring plaintiff's inappropriate behavior. (<u>Id</u>.)

On March 19, 2009, plaintiff received another out-of-school suspension after tearing the leather seat cover completely off of a seat on the school bus. (Tr. p. 160). An in-school-suspension was again imposed on April 22, 2009 after plaintiff began yelling and was put out of class. (<u>Id</u>.). Following a fight in the Junior Hall on May 1, 2009, plaintiff was sent to the lunch room where he kicked a table, threw chairs around, refused to follow instructions, and ultimately stormed out without permission. (Tr. p. 155). Around the same time, plaintiff became involved in an argument with two other students in the restroom and was suspended yet again. (<u>Id</u>.).

On May 8, 2009, plaintiff underwent a consultative psychological evaluation by Dr. Sandra Durdin. In her written report, the doctor described the presenting problems as

developmental delays and an adjustment disorder and noted that plaintiff had received SSI benefits since the age of six. After reviewing plaintiff's school records, Dr. Durdin observed that plaintiff's speech and language impairments did not adversely impact his academic performance and were not the cause of his control problems. Rather, plaintiff appeared to deliberately break rules. Plaintiff's grooming was good but his nails were chewed.

In terms of background, plaintiff was one of six children, including his twin, some of whom had failed various grades at school and one of whom was receiving SSI benefits. Plaintiff's mother worked at a fast food restaurant and the fathers of her children provided nothing in the way of support. She reported that plaintiff had failed the fourth grade LEAP test and did not attend summer school. Plaintiff had repeated the second or third grades, possibly the fourth, but his mother was not quite sure which two grades he had failed. He was at that time in the fifth grade at the Northwood Alternative School. For his part, C.L.P. reported that he had repeated the fourth grade, "maybe kindergarten", and that other students were the problem but that the teacher yelled at him instead. Plaintiff was on no medication at the time, ate and slept well, and had friends to play with including a "negative friend." Interests included rap music, singing, and playing the drums. Dr. Durdin remarked that plaintiff's adaptive skills were adequate and that math was his poorest subject. Although plaintiff

8

did not listen at school he reportedly heeded his mother's instructions at home. His behavior problems first manifested themselves in the fourth grade when his mother began getting phone calls from school about his behavior.

In terms of test results, plaintiff's speech and language were fully intelligible and his vocabulary was adequate. His pace was normal, he was persistent and alert, and attention, concentration, and the ability to follow directions were good. Abstract reasoning was fair and thought organization was logical. Plaintiff was defensive about his negative behavior but there were no reports of any perceptual distortions or suicidal or homicidal ideations. Insight and judgment were fair. In the WISC IV, plaintiff obtained a verbal comprehension score of 83, a perceptual reasoning score of 77, a working memory score of 80, a processing speed score of 83, and a full scale score of 75, placing him in the borderline to low average range of intelligence. However, in the doctor's opinion, the full scale IQ score was likely a slight underestimation of plaintiff's potential but was adequately valid for consideration along with the other testing data. As plaintiff's age increased so, too, did his conduct problems. Dr. Durdin's diagnostic impression was as follows: Axis I - oppositional defiant disorder; Axis II - learning disorder, not otherwise specified; and, Axis III - deferred. In summary, the doctor opined that plaintiff's ability to acquire and use information was below average but not markedly

or severely impaired.  His ability to attend to and complete tasks was adequate when he cooperated but his ability to interact and relate to others was variable.  Plaintiff's ability to move about and manipulate objects was good and his ability to care for himself was adequate.  Health and physical well-being were deferred.  (Tr. pp. 189-192).

By September 28, 2009, plaintiff was once again attending the Hammond Westside Upper Elementary School where he received an in-school suspension for shoving a female classmate while in line and then threatening the teacher while being escorted to the principal's office.  (Tr. p. 158).  Approximately two weeks later, plaintiff received another out-of-school suspension after calling a fellow student a "retarded ass".  (Id.).  On October 26, 2009, yet another in-school suspension was imposed on plaintiff for leaving the classroom without permission and talking back to the teacher.  (Tr. p. 161).  Plaintiff was suspended from the school bus on November 8, 2009 for failing to sit down and for sticking his arm out of the window on a nearly daily basis.  (Id.).  Throughout this time, plaintiff was a sixth grade special education student and his most recent report card as of November 16, 2009 included four F's, two D's, and an "N".  (Tr. pp. 118, 153, 154, 157, 193).

On November 25, 2009, pursuant to a referral from Dr. Overton, plaintiff underwent a psychosocial evaluation by a nurse

10

practitioner at the Multipractice Clinic in Independence, Louisiana. Presenting problems included getting in trouble, an inability to stay still, chewing his nails, punching himself, and taking his shoes off at school. Teachers and counselors reported that plaintiff was defiant and would not finish his work, instead wanting to be the "boss". The complaint checklist was positive for plaintiff being very unhappy, irritable, having temper outbursts, being withdrawn, overactive, having peer conflict, being impulsive, getting in trouble with the law, and running away. Plaintiff reportedly twisted his hair, bit his nails until they bled, and expressed an intention to kill himself. He stayed out all night riding his bike or at a friend's house, had headaches, lied, was sexually preoccupied, stole candy, was increasingly disobedient and disrespectful, was easily distracted, and had problems with task completion. Plaintiff craved respect but was uninterested in making any personal changes.

In terms of mental health history in the family, plaintiff's mother reported that the relatives of C.L.P.'s father received disability checks for reasons that were unknown. The nurse practitioner also reported increasing financial difficulties after plaintiff's benefits had been discontinued in July. Plaintiff was becoming increasingly non-communicative with his mother. His educational history was described as having failed the fourth grade and kindergarten. Plaintiff had recently been transferred from the

sixth to the seventh grade to see if he would perform better in the correct grade for his age but it was expected that he would be sent back to the sixth grade after no improvement was seen and he had earned all F's.   When asked to describe his relationship with classmates plaintiff refused to answer.   He attended anger management classes three times per week which his mother stated was not helping.   Plaintiff was on probation at the time for stealing and running away and he had begun to fraternize with a group of boys who were a bad influence and engaged in gang fights. Plaintiff presented as very sad and sullen with a bad attitude, refusing to speak with the nurse practitioner.   The diagnosis was depression/anger and possible ADHD with impulse control disorder/oppositional defiant disorder.   (Tr. pp. 221-226, 179, 188, 208).

On November 30, 2009, plaintiff was sent to the Florida Parishes Juvenile Detention Center ("FPJDC") to be housed there. (Tr. p. 112).  On December 16, 2009, plaintiff underwent counseling with a social worker at the Multipractice Clinic who noted a diagnosis of conduct disorder, a learning disorder by history, and a mood disorder not otherwise specified.   In the previous six to twelve months, plaintiff had been aggressive, destructive to property, had stolen, and had violated curfew, landing him in FPJDC.  He had a history of problems at school, including being defiant, refusing to finish his work, being hyperactive, and

generally "clowning around". Plaintiff suffered from mood swings, was impulsive, and had outbursts when limits were set. Participation with the social worker was very limited with an angry affect and body language.  In November, plaintiff stated that he had tried to hang himself with a belt.   The social worker's impression was a mood disorder versus ADHD.  (Tr. pp. 178, 206, 219).

In early January of 2010, plaintiff underwent medical screening at FPJDC.  Plaintiff was cooperative but suffered from other unidentified observable signs of depression.  (Tr. pp. 195-196).  On January 7, 2010, plaintiff returned to the Multipractice Clinic where he was once again seen by the social worker for evaluation of his conduct and mood disorders.  He was at that time home on a pass after being housed at FPJDC for leaving home without permission and for being arrested for fighting.  Plaintiff had an angry affect and mood and was observed to be wearing jeans that were at least two sizes too small, thus exposing his buttocks.  He was focused on his mother in a negative, angry manner, disliking her rules and expressing a desire to move to his godmother's house. Plaintiff further stated that he got in trouble on purpose to avoid living with his mother.  He was also focused on his pants.  The impression was signs and symptoms of ADHD, behavior disorder, oppositional defiant disorder, and conduct disorder.  Plaintiff was noted to ruminate and to feel depressed but he was agreeable to

13

taking his medication to help control his anger.  (Tr. pp. 177, 202, 205, 220).

On January 12, 2010, plaintiff was seen by a nurse practitioner at the Multipractice Clinic.  His behavior was agitated and replete with outbursts, his speech was mumbled or was refused altogether, his mood was depressed and angry, his affect was constricted and labile, he was noted to talk to himself, his concentration was poor, and his sleep was fair with difficulty falling asleep.  Plaintiff was noted to tear up things and leave holes in walls.  He was still housed at FPJDC on this date but was attending Northwood Prepatory High School.  Plaintiff was prescribed Lexapro and Abilify.  (Tr. pp. 180, 198, 214).  The following day, the nurse practitioner formally requested a psychiatric evaluation for plaintiff and further communication via phone with the social worker and psychiatrist.  The nurse practitioner further noted that problems in areas of cognition, energy, concentration, mood regulation, and impulsivity may lower plaintiff's academic performance.  (Tr. pp. 187, 207).

On January 14, 2010, the principal of Northwood Prepatory High School faxed a handwritten note denying that plaintiff had been enrolled there during the current school year.  (Tr. pp. 127-128).  Plaintiff was seen again by his social worker at the Multipractice Clinic on January 20, 2010 who noted that he was more appropriately dressed, had an appropriate affect and mood, and was cooperative.

14

Plaintiff was hopeful that he would be released from FPJDC in two weeks absent which he was prepared to serve out the remainder of his time.  Plaintiff was less focused on his mother and was more focused on addressing his anger.  The social worker noted that plaintiff was significantly less angry and had clearer thought processes although judgment and the ability to express feelings were poor.  The plan was for further cognitive behavioral therapy, anger and coping skills, and medical management.  Plaintiff was noted to have a court date on February 10, 2010.  (Tr. pp. 186, 200, 209).

On February 1, 2010, a clinician at FPJDC authored a "To Whom It May Concern" letter in which she recalled that plaintiff had been housed there since November 30, 2009 where he was receiving individual therapy.  Plaintiff was noted to be open and cooperative during the sessions, communicated clearly, was able to remain focused, and displayed motivation to set and achieve goals related to his behavior at the facility and with coping with his incarceration.  Plaintiff remained on Abilify and Lexapro.  (Tr. p. 228).  Plaintiff was next seen by his social worker at the Multipractice Clinic on February 2, 2010 who remarked that his upcoming court date was for a charge of aggravated rape that allegedly occurred in August of 2009 that plaintiff denied any involvement in.  No problems with mood or behavior were noted. Plaintiff was initially defensive but was ultimately receptive to

15

hearing from his mother about how his behavior had affected family members.  The social worker's impression was that plaintiff tended to hide behind street talk and "bravisimo".  (Tr. pp. 175, 203, 218).

Plaintiff returned to his nurse practitioner at the Multipractice Clinic on February 11, 2010 for medication follow-up. He was observed to be well-groomed, to behave appropriately, and to actually speak and answer questions during the course of the visit. However, plaintiff's mood was still depressed with a flat affect and he was noted to still be chewing his nails.  Cognition, sleep, and appetite were all good.  Plaintiff continued to be housed at FPJDC where he was now at a level "2" with no behavioral issues reported.   He had demonstrated self-control at the court proceedings of the previous day even though he was angry.  The diagnosis was major depression and a single episode of suicidal ideation.  The dosage of Lexapro was increased and plaintiff was continued on Abilify. (Tr. p. 213).  Plaintiff attended a further counseling session with his social worker on February 17, 2010 where he complained of increased anxiety and sleep disturbances as a result of his pending criminal charges.  Cognitive behavioral therapy was to be continued and family support was stressed. (Tr. p. 217).

On February 19, 2010, the Tangipahoa Parish School System's Department of Special Education issued a comprehensive Multi-

Disciplinary Evaluation with input from an evaluation coordinator, special and regular education teachers, a pupil appraisal social worker, a speech therapist, an educational diagnostician, a registered nurse, and plaintiff's mother.  During her interview, plaintiff's mother recalled problems that began in kindergarten and resulted in suspensions for aggressive behavior towards others and non-compliance.  Over the years, plaintiff's behavior had become more severe at school and at home and was now spilling over into the community.  As a result, plaintiff's mother had lodged ungovernable charges against him with the juvenile authorities and a probation officer was assigned.  During the current school year there were times when plaintiff would not come home for several days and on the most recent occasion he had been arrested for robbery and placed in FPJDC.  Plaintiff had limited phone contact with his father and learning problems were reported throughout the whole family.  He was becoming increasingly aggressive and defiant and associating with the wrong crowd.  Plaintiff was able to participate in regular physical education classes and physical problems were limited to headaches which were decreasing in severity.  Suicidal ideations were denied at the time.  Upon being interviewed by the nurse at FPJDC, plaintiff was looking forward to being released and stated that he intended to be more respectful to his mother, to follow rules, and to do better in school.

At the time of the comprehensive evaluation plaintiff was

fourteen years of age and was in the seventh grade, having been administratively moved there from the sixth grade. He had been held back in the fourth grade after failing the LEAP test. Plaintiff's report card on November 11, 2009 included four F's and two D's. Informal Brigance scores that were obtained when plaintiff was in the sixth grade revealed that he was functioning at the fifth grade level in reading comprehension; at the fourth grade level in word recognition, oral reading, spelling, and sentence writing; at the second grade level in math calculation; and, at the first grade level in math problem solving. Plaintiff's sixth grade teacher reported that plaintiff had the ability to do sixth grade work but allowed inappropriate classroom actions to interfere with his learning, including talking out, bothering others, laughing, refusing to participate in classroom discussions, and refusing to complete assigned work. Assessing plaintiff's true capabilities was difficult given his lack of cooperation and compliance.

Plaintiff's behavior during the evaluation itself was appropriate, he was confident with his abilities and accepting of his work, his responses were deliberate, and his pace was adequate. C.L.P. was aware of some mistakes and was concerned about the adequacy of his responses but when tasks became difficult he gave up easily. Overall, the test results appeared to be a valid assessment of his current academic functional level. As part of

18

the testing, plaintiff was administered the WJ III Achievement Test in which he received low and low average scores in reading, low and very low scores in mathematics, and very low to low average scores in written language.  Results of diagnostic testing revealed that plaintiff was functioning in the low average range in reading and in the low range in mathematics, math calculation skills, written language, and written expression.  When compared to others at his age level, plaintiff's fluency with academic tasks was in the low average range, his academic skills were in the low range, and his ability to apply those academic skills was in the very low range.

As part of the Multi-Disciplinary Assessment a psychological assessment was conducted by the school psychologist.  In connection with that assessment, plaintiff's discipline folder from the 2008-2009 and 2009-2010 school years was reviewed which included numerous rules violations that resulted in in and out-of-school suspensions and placement in an alternative school.  Plaintiff's placement in FPJDC was also noted.  When interviewed, plaintiff stated that he liked school with math being his favorite subject and science being his least favorite.  He stated that he worked well independently and that he got along with his classmates and teachers.  Plaintiff also stated that if he could change something about himself he would like to have less anger.  Plaintiff was administered the Conners 3rd Edition Short Form test that was geared to assessing youth for ADHD and other related disorders that most

commonly co-occur with ADHD.  Rating dimensions included inattention/oppositional, hyperactivity/impulsivity, learning problems, executive functioning, aggression, and peer relations. When rated by his mother, plaintiff had very elevated scores in every dimension.  When rated by his teachers, plaintiff had very elevated scores in every dimension except hyperactivity/impulsivity which was elevated.  On the self-report, plaintiff gave himself average scores in three dimensions, an elevated score in aggression, and a very elevated score in family relations.

Plaintiff was also visually observed during a testing session conducted at FPJDC and was noted to be respectful, responsive, well-groomed, and calm.  However, according to one of his previous teachers plaintiff was often disinterested, inattentive, and attempted to sleep during instructional times.  During unstructured times plaintiff conversed loudly with other students and usually dominated the conversations.  Plaintiff did not follow school rules but often corrected other students when they behaved in the same fashion.  Assignments were only completed when plaintiff was given one-on-one attention.  He lacked motivation in class and was more focused on how other students perceived him.

The Multi-Disciplinary Evaluation also included a functional behavioral assessment.  Plaintiff's primary behavioral concerns were identified as using inappropriate language, making verbal threats to peers, and being aggressive which were associated with

events such as independent seat work, direct orders, reprimands, inability to complete tasks, lack of structure, and negative peer attention.  Plaintiff's inappropriate behavior was believed to be triggered when the curriculum exceeded his ability, to gain attention from peers, and possibly family stressors.  Corrective measures had been unsuccessful.  It was believed that plaintiff's inappropriate social and behavioral problems interfered with his relationships with others and his ability to learn and were more than a temporary response to stressful events in the environment. Plaintiff was currently receiving speech therapy in an attempt to address deficits in receptive and expressive language skills but his previous therapist reported little progress due to lack of motivation and participation and behavior-related school absences. Overall oral language skills were in the low range.

Results of a school psychological assessment revealed C.L.P. to have a severe, disruptive, and/or incapacitating limitation of behavior that significantly and adversely affected his educational performance.  Based on the results of the evaluation, various recommendations were made with the priorities being identified as aggression, mathematics fluency and calculation, mathematics problem solving, and reading comprehension.  Plaintiff's exceptionality was identified as an emotional disturbance with severe, disruptive, and incapacitating functional limitations of behavior which had persisted for at least a year.  (Tr. pp. 230-

21

252).

On March 19, 2010, an Administration psychologist reviewed plaintiff's file as it was then extant and set forth his findings in a "Child Disability Evaluation Form". Plaintiff's impairments were identified as oppositional defiant disorder and a learning disorder, not otherwise specified, impairments which were severe but did not meet, medically equal, or functionally equal one of the impairments set forth in the Listing of Impairments. In conducting his functional equivalence analysis, the psychologist found that plaintiff had a marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, and a less than marked limitation in the remaining four domains set forth in §416.926a(b)(1). (Tr. pp. 253, 254-260).

On August 18, 2010, an in-school conference was scheduled with plaintiff's mother after plaintiff interrupted a talk with another student and uttered an expletive several times after being told to mind his own business. (Tr. p. 150). On August 31, 2010, plaintiff underwent a psychological evaluation by Dr. Brandon Romano pursuant to a referral from the Office of Juvenile Justice. That evaluation involved clinical interviews with C.L.P. and his mother, a mental status examination, standardized testing, and a records review. According to the records the doctor had been provided, plaintiff had been adjudicated delinquent for two counts of being "ungovernable", principal to theft, truancy, theft, and

22

simple assault.  His mother identified his problems as fighting, arguing, punching holes in the wall, throwing things, and refusing to abide by her rules.  A case narrative indicated that plaintiff had been removed from the school bus for inciting a riot, disrespect to teachers, and for being disruptive in class. Plaintiff was fourteen years of age at the time and frequently engaged in physical altercations which were estimated to be approximately thirty in number.  Plaintiff's stepfather had apparently passed away earlier in the month and plaintiff's mother was unemployed.  Over the years plaintiff had witnessed excessive arguing between his mother and biological father as well as domestic violence.  His mother reported that plaintiff had previously struck a girl.  There was also a history of legal problems in the family.

At the time of the evaluation, plaintiff was enrolled at Crystal Academy of Northwood Middle School in a program for children with behavioral problems.  Plaintiff had last completed the seventh grade and was in regular education classes where he received D's and F's.  Plaintiff denied a history of being bullied or bullying others but admitted to being expelled two to three times and being suspended more than ten times for fighting.  He also admitted to pulling a knife on his brother, destroying his mother's furniture and putting holes in her door, leaving home without permission, stealing, and being removed from class due to

aggressive behavior.  Placements in FPJDC had occurred in November of 2009 and May of 2010.

Upon mental status examination, plaintiff's appearance was appropriate and he was oriented in all four spheres.  His speech was low but his thought process was linear and goal-directed. Plaintiff was unable to describe his mood and his affect appeared angry at times.  He was initially uncooperative but became more cooperative as the evaluation progressed, eye contact was limited, and he appeared to be fidgeting during most of the examination. There was no evidence of psychosis and hallucinations were denied but plaintiff complained of a variety of symptoms of depression including a reported failed suicide attempt.  Plaintiff denied homicidal ideation but his mother indicated that he had written a letter stating that he hoped she would die.  Nervous habits were also reported as were symptoms of ADHD but symptoms of anxiety were denied.  Plaintiff was not manic, obsessive-compulsive, or suffering from post-traumatic stress.

As part of the evaluation plaintiff was administered the Shipley-2 psychological test to assess his intellectual functioning.  Plaintiff obtained low scores in that test but the accuracy of those results was questioned as plaintiff did not appear to put forth his best effort.  In the MAYSI-2 test, plaintiff obtained elevated scores in the caution range on the angry-irritable, depressed-anxious, somatic complaints, and suicide

ideation scales.  Results from the SASSI-AZ test indicated a high probability for a substance abuse disorder being present but plaintiff denied any substance abuse.  Although the results of the mental status examination were within normal limits plaintiff appeared to have severe conduct and anger management problems as well as symptoms of ADHD and depression.  Dr. Romano's impressions were as follows: Axis I - depressive disorder, not otherwise specified; conduct disorder, childhood-onset type; ADHD, combined type; reported learning disorder, not otherwise specified; and, parent child relational problems; Axis II - deferred; Axis III - deferred to physician; Axis IV - problems related to interaction with legal system/crime; problems with primary support systems; and, educational problems; and, Axis V - a GAF of 50. Recommendations included counseling; psychiatric, behavioral, and social monitoring; IQ reassessment; an updated IEP; encouragement to participate in prosocial youth activities; and, family therapy. Without treatment, plaintiff's prognosis was felt to be poor.  (Tr. pp. 269-278).

On September 9, 2010, plaintiff's mother identified plaintiff's medications as including 10 mg. of Lexapro once per day, 5 mg. of Abilify twice per day, and 30 mg. of Vyvance once per day, all of which had been prescribed by Dr. Sharp.  She also added that plaintiff was suspected of being bipolar and that he received at-home counseling three times per week.  (Tr. pp. 129-132).  On

September 13, 2010, plaintiff received yet another out-of-school suspension, this time two days in length, after he left his seat, walked nearly the length of the cafeteria in an effort to start a fight, and would not sit down or remove himself when told. A conference with plaintiff's mother and probation officer was to take place after the suspension. (Tr. pp. 150, 163).

On October 5, 2010, plaintiff was suspended yet again, to be followed by a conference with his mother, after he made an upsetting comment to a female student in a no-talking area, threatened to punch her, and launched into a litany of profanity upon being asked to leave the cafeteria. It was also noted that plaintiff continued to go to school out of uniform although he had been provided appropriate footwear. (Tr. pp. 151, 165). By October 7, 2010, the dosage of plaintiff's Vyvance had been increased to 40 mg. every day. (Tr. pp. 267-268). On October 11, 2010, plaintiff's cell phone went off in class and he refused to surrender it to school officials after being asked several times by school authorities, ultimately blaming his behavior on the fact that he had not taken his medication. That resulted in plaintiff's mother being summoned to school who took his phone, gave him medication, and removed him from school for the day. (Tr. p. 152). Two days later, C.L.P. was asked to leave the cafeteria after being warned four times about talking and making a disturbance. He then told the school official not to call his "f*@!#&g name", threw an

elbow at the official, and was physically escorted out of the cafeteria, all the while continuing to be defiant, using profanity, and making threats.  (<u>Id</u>.).

The administrative record contains a computerized printout of plaintiff's student record dated November 10, 2010 for the 2010-2011 school year.  Plaintiff was in eighth grade special education classes at the time where he had received five A's, one B, one C, and one D thus far that school year.  (Tr. pp. 148-149).

As noted earlier, on November 10, 2010, a hearing <u>de novo</u> before an ALJ went forward with plaintiff and his mother in attendance.  Upon being duly advised of her right to representation, plaintiff's mother elected to proceed with the hearing in proper person.  After the documentary exhibits were admitted into evidence, plaintiff took the stand and was questioned by the ALJ.  Plaintiff was fourteen years of age at the time and was in the eighth grade where he was doing well although he had some admitted problems which included responding aggressively to others, biting his nails, and generally being nervous and twitchy. Despite taking medication which was sometimes effective, he remained angry all the time which was manifested by punching or kicking the doors of his house and sometimes hitting other people. Plaintiff recalled an encounter with law enforcement officials after he had allegedly struck someone with a broom.  After being threatened with detention, plaintiff curbed his behavior but he

still kicked a hole in a door in anger.  Despite the threat of
detention, plaintiff testified that he had repeated his broom-laden
assault but had fled to avoid apprehension.  He was also known to
steal candy and other items from the grocery store which had landed
him in FPJDC.  Plaintiff's probation had ended on November 4, 2010
but he had another court date scheduled for November 17, 2010 in
connection with the recent destruction of parts of his mother's
house.  (Tr. pp. 35-43).

Continuing, plaintiff testified that he had siblings whom he
previously but no longer fought with as he now preferred to fight
with other non-relatives instead.  He was constantly involved in
fights at school and neither medication nor counseling sessions
every two to three weeks were effective in controlling his
behavior.  Having failed the fourth grade, plaintiff should have
been in the ninth grade but he did have friends who had been held
back like himself.  After doing poorly in regular education classes
as a result of his anger and anti-social behavior, plaintiff's
grades were improving as a result of his placement in special
education classes that were two to three students in size.
Plaintiff aspired to be a rap artist or a football player but
acknowledged that his poor behavior was not properly preparing him
for those vocations.  He also acknowledged the need to stay out of
detention, to do well in school, and to listen to his mother but
his behavior lacked consistency.  Physically, plaintiff was strong

and healthy but daily prescribed medication did cause some stomach upsetment. (Tr. pp. 43-49).

Plaintiff's mother then took the stand and was questioned by the ALJ. She testified that plaintiff experienced mood swings, refused to listen, and was difficult to control as a result of bipolar tendencies and ADHD. He had tried to stab his brother once, was in and out of court, engaged in destructive behavior at home, had run-ins with the police, stole, and got into fights. Plaintiff had been on medication since 2009 which produced little improvement. He refused to listen to authority figures and was known to sneak out of his house. Plaintiff was on his second counselor whom he saw three times per week and who believed that medication was lessening his symptoms. There was no use of alcohol or illicit drugs. (Tr. pp. 49-51). Upon further questioning, plaintiff testified that his hobbies included rapping, visiting with friends, and playing football. (Tr. pp. 51-52). Plaintiff's mother then testified that another doctor's appointment had been scheduled for November 29, 2010 and that he had previously received some form of disability benefits for being a slow learner until June when the benefits were discontinued. She attributed plaintiff's developmental problems to his premature birth, delayed and non-understandable speech, and learning deficits at school. Plaintiff continued to be a nervous type, chewing his nails and toes from an early age until they bled. (Tr. pp. 53-55).

The final piece of documentary evidence that was admitted into the record was a letter dated November 29, 2010 from plaintiff's Juvenile Probation & Parole Officer to plaintiff's mother advising that he had been placed at a facility named Camelia House effective that day.   In connection with that placement, Ms. Grant was provided with a copy of Camelia House's rules and regulations regarding visitation, mail, and phone contact.  (Tr. pp. 168-174).

As noted earlier, plaintiff challenges the Commissioner's decision to deny him SSI benefits on two grounds.  In the second of those, plaintiff argues that the ALJ erred in finding that he had less than marked limitations in attending and completing tasks and in caring for himself.  Finding that contention to have merit, a discussion of plaintiff's first challenge will be pretermitted and it will be recommended that plaintiff's case be remanded to the Commissioner for an award of benefits.

If the third step in the §416.924 analysis is reached, the ALJ must determine if the claimant's medically determinable severe impairments meet, medically equal, or functionally equal the criteria of one of those set forth in the Listing of Impairments. 20 C.F.R. §416.924(d).  In determining whether a child's impairment is functionally equal to one of those set forth in the Listing of Impairments, the ALJ assesses the child's limitations in six domains, with listing-level severity being established if the child has "marked" limitations in two domains or if he has an "extreme"

limitation in one domain.  20 C.F.R. §416.926a(a).

In conducting his functional equivalence analysis in the present case, the ALJ found that plaintiff had a marked limitation in interacting and relating with others but that he had less than marked or no limitations in the remaining five domains.  Thus, a finding that plaintiff had a marked limitation in any one of those other five domains would establish functional equivalence and listing-level severity.  As was touched upon earlier, a marked limitation exists when an impairment or combination of impairments interferes seriously with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. §416.926a(e)(2)(i).

In the domain of caring for yourself, the Commissioner considers "... how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions and living area." 20 C.F.R. §416.926a(k).  The relevant portions of the Commissioner's functional equivalence Regulation provide the following guidance in the domain of caring for yourself:

> (1) *General*. (I) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety.  It is characterized by a sense of independence and competence.  The

31

effort to become independent and competent should be observable throughout your childhood.

(ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

20 C.F.R. §416.926a(k)(1).

The Regulations then set forth the following age group descriptors for evaluating functional equivalence in the "caring for yourself" domain as well as some examples of limited functioning in that area:

(v) *Adolescents (age 12 to attainment of age 18).* You should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry

32

feelings or listening to music to calm yourself down).  You should begin to think seriously about your future plans, and what you will do when you finish school.

(3) *Examples of limited functioning in caring for yourself*. The following examples describe some limitations we may consider in this domain.  Your limitations may be different from the ones listed here.  Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one.  As in any case, your limitations must result from your medically determinable impairment(s).  However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i)  You continue to place non-nutritive or inedible objects in your mouth.

(ii)  You often use self-soothing activities showing developmental regression (e.g., thumb sucking, re-chewing of food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).

(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.

(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.

(v)  You do not spontaneously pursue enjoyable activities or interests.

(vi) You have disturbance in eating or sleeping patterns.

> 20 C.F.R. §416.926a(k)(2)(v) and (3).

Providing further guidance in evaluating functional equivalence is Social Security Ruling 09-7p, 2009 WL 396029, which emphasizes that the domain of "caring for yourself" does not address children's physical abilities to perform self-care tasks but instead focuses on how well a child relates to himself by maintaining a healthy emotional and physical state in ways that are

33

age-appropriate in comparison to other same-age children who do not
have impairments.   "In addition to regulating emotional well-
being," .... SSR 09-7p instructs, "... a child must be able to
satisfy physical wants and needs every day", requiring "...
children to have a basic understanding of their own bodies,
including their bodies' normal functioning, and adequate emotional
health for carrying out the tasks involved in self-care."  The
domain of "caring for yourself" thus centers on "... the emotional
ability to engage in self-care activities, such as feeding,
dressing, toileting, and maintaining hygiene and physical health"
as well as following safety rules, responding to circumstances in
safe and appropriate ways, and making decisions that do not
endanger oneself.  SSR 09-7p, 2009 WL 396029 at *3-4.

     In the present case, the ALJ made the following findings in
concluding that plaintiff had a less than marked limitation in the
domain of "caring for yourself":

> [t]he claimant's testimony indicates he may sometimes
> experience confusion in the way he feels about himself.  He
> reports feeling anxious, nervous, angry and frustrated.  He
> states that he hits others and kicks and punches holes in the
> wall because of his anger.  The claimant sees a therapist
> three times each week and takes medication.  Ms. Grant reports
> her son get[s] angry for no reason.
>
> The evidence indicates the claimant can control himself when
> he really wants to [Ex 8F].  Additionally, he testified that
> after the police warned him that he would go to juvenile
> detention, his behavior improved.

                                                 (Tr. p. 27).

     The evidence cited by the ALJ in the "caring for yourself"

domain thus consists of the testimony that plaintiff gave at the administrative hearing as well as an exhibit that was entered into the record below as number 8F.  The latter exhibit consists of a letter from a clinician at FPJDC dated February 1, 2010 where plaintiff had been housed since November 30, 2009, a period of approximately two months.  In that letter, the clinician remarked that plaintiff was receiving individual therapy; was open, cooperative, communicated clearly, and was focused during therapy sessions; displayed motivation to set and achieve goals related to his behavior at the facility; and, was working on coping with his incarceration and maintaining positive behavior to earn "daily points".  (Tr. p. 228).  As the Social Security Regulations make clear, however, a child's placement in a structured setting may not be an appropriate litmus against which to measure the appropriateness of his behavior as compared with a child who does not have a functionally limiting impairment and who thus does not need such a structured environment.  20 C.F.R. §416.924a(b)(5)(iv). In other words, the need for placement in a structured setting like FPJDC to achieve an acceptable level of compliance is more suggestive of a functionally limiting impairment.  See also Hodges for M.H. v. Astrue, No. 10-CV-2769, 2011 WL 4736312 at *1 (E.D. La. Oct. 6, 2011)(need for greater support equates with greater severity of limitation).

As for plaintiff's hearing testimony, he readily testified to

being aggressive, destructive, and hitting others.   Plaintiff admitted striking someone with a broom and initially curbing his behavior when threatened with detention by the police.   (Tr. pp. 40-41).   However, when asked if he had repeated that behavior, plaintiff candidly admitted that he had but had then fled to avoid apprehension.   (Tr. p. 41).   Other run-ins with the law were precipitated by stealing, running away from home as early as age thirteen, curfew violations, and possible involvement in robbery and rape.   In addition to wielding a knife on his brother, other destructive behaviors included biting his fingernails until they bled, hitting himself, destroying furniture and property, and a reported failed suicide attempt.

        In terms of plaintiff's behavior at school, instances of inappropriate conduct, some of which were potentially self-injurious, included repeatedly arguing with, cursing, threatening, and striking other students and school officials; destroying school property; refusing to wear appropriate attire; and, continually sticking his arm out of the window of the school bus.   The record contains documentary evidence of numerous out-of and in-school suspensions as a result of plaintiff's aggressive and destructive behavior, some of which were followed by conferences with plaintiff's mother and probation officer.   Practitioners at the Multipractice Clinic observed plaintiff to wear undersized clothing that exposed his buttocks and he intentionally got into trouble to

avoid living at home with his mother.  From a performance standpoint, despite being held back in fourth grade, plaintiff repeatedly obtained very low grades in regular education classes and a Multi-Disciplinary Evaluation revealed him to be performing, at age fourteen and in the seventh grade, in the fourth, second, and even first grade levels in some academic areas.  The psychological assessment that was conducted as part of that evaluation showed plaintiff to have severe, disruptive, and incapacitating limitations of behavior which significantly and adversely affected his educational performance.

Pursuant to a reference from the Office of Juvenile Justice, plaintiff was psychologically evaluated by Dr. Romano at age fourteen.  By that time, plaintiff had been adjudicated delinquent for being ungovernable, thefts, truancy, and simple assault.  On one occasion, he had reportedly been removed from the school bus for inciting a riot.  Plaintiff had been involved in thirty physical altercations, including one in which he had allegedly struck a girl, and despite denying that he bullied others, he had been expelled two or three times and suspended over ten times for fighting.  Dr. Romano's diagnosis included severe conduct and anger management issues, ADHD, and depression.  Although not binding upon the Commissioner, plaintiff was also assessed a GAF score of 50 which is indicative of serious symptoms or serious impairment in social, occupational, or school functioning.  Williams v. Astrue,

37

No. 11-CV-1587, 2012 WL 3262427 at *6 n.7 (S.D. Tex. Aug. 7, 2012). Subsequent to the hearing before the ALJ, plaintiff was placed in another structured setting called Camelia House.  The Court also cannot help but notice the three references in the record, one made to Dr. Durdin, one to the Multipractice Clinic practitioners, and via testimony at the administrative hearing, that plaintiff had previously received some form of disability benefits which had possibly been discontinued in the summer of 2009.  That evidence was not explored or even mentioned by the ALJ.

In Carter o/b/o J.A.C. v. Astrue, No. 07-CV-1731, 2009 WL 1203355 at *6-7 (W.D. La. May 1, 2009), the court was presented with evidence of inappropriate conduct at school that was very similar to the matter at hand.  That evidence included several suspensions and an expulsion that "... obviously prevented [the plaintiff] from attending school on a regular basis." (Id.).  In view of that evidence, the court in Carter ruled as follows:

> [t]he record shows that J.A.C. has not shown an ability to recognize what is acceptable and unacceptable behavior or an ability to control his behavior or avoid behaviors that are bad for him.  Accordingly, the undersigned concludes that substantial evidence does not support the ALJ's determination that J.A.C. does not have at least a marked impairment in this domain.
>
> As discussed above, an impairment functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one domain.  The record clearly shows that J.A.C. has at least a marked impairment in at least two areas; interacting and relating with others and his ability to care for himself.  The ALJ's conclusion to the contrary is not supported by substantial evidence.

38

<u>Carter</u>, 2009 WL 1203355 at *7.

In light of that finding, the court in <u>Carter</u> ordered that the Commissioner's decision be reversed and that the child be awarded SSI benefits.  <u>Carter</u>, 2009 WL 1203355 at *8.  The same result was reached by the Court in <u>Harris for J.H. v. Astrue</u>, No. 10-CV-1745, 2011 WL 6100622 (E.D. La. Nov. 3, 2011), <u>adopted</u>, 2011 WL 6100512 (E.D. La. Dec. 6, 2011).  An even more compelling case for that conclusion is made here as plaintiff's inappropriate conduct has spilled over from school into the community at large.  Because "[r]ating the limitations caused by a child's impairment(s) in each and every domain that is affected is not 'double-weighting' of either the impairment(s) or its effects", SSR 09-7p, 2009 WL 396029 at *4, the same result as in <u>Carter</u> and <u>Harris</u> should obtain here. <u>Hodges</u>, 2011 WL 4736312 at *2.  It will be so recommended.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be granted, that defendant's motion for summary judgment be denied, and that plaintiff's case be remanded to the Commissioner for an award of benefits.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass</u> <u>v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this  28th  day of _____June_____, 2013.



_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

40